1

2

3

4

5

6                              UNITED STATES DISTRICT COURT

7                               EASTERN DISTRICT OF CALIFORNIA

8

9    SUSAN LYNNE ASHMORE,                    No. 1:17-cv-01142-GSA

10                    Plaintiff,

11           v.                              **ORDER DIRECTING ENTRY OF
                                             JUDGMENT IN FAVOR OF THE**
12   NANCY A. BERRYHILL, Acting              **COMMISSIONER OF SOCIAL SECURITY**
     Commissioner of Social Security,        **AND AGAINST PLAINTIFF**
13

14                    Respondent.

15

16
              **I.      Introduction**
17
              Plaintiff Susan Lynne Ashmore seeks judicial review of a final decision of the
18
     Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for
19
     disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is
20
     currently before the Court on the parties' briefs which were submitted without oral argument to
21
     the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 13, 16 and 17**.**  Having
22
     reviewed the record as a whole, the Court finds that the ALJ's decision is based an appropriate
23
     legal standards and supported by substantial evidence. Accordingly, the Court affirms the
24
     Commissioner's denial of benefits to Plaintiff.
25
     ///
26

27   _____
     [1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 7 and 8.
28
                                                  1

## II.      Procedural Background

On September 4, 2013, Plaintiff filed an application for disability insurance benefits, alleging disability beginning February 2, 2013.  AR 14.  The Commissioner denied the application initially on December 30, 2013, and upon reconsideration on June 3, 2014.  AR 14.  On July 23, 2014, Plaintiff filed a timely request for a hearing.  AR 14.

Administrative Law Judge Cynthia Floyd presided over an administrative hearing on April 28, 2016.  AR 36-72.  Plaintiff, represented by an attorney, appeared and testified.  AR 36.  An impartial vocational expert, Cheryl Chandler, also appeared and testified.  AR 36.

On June 29, 2016, the ALJ denied Plaintiff's applications.  AR 14-30.  The Appeals Council denied review on July 5, 2017.  AR 1-3.  On August 24, 2017, Plaintiff filed a timely complaint seeking this Court's review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Doc. 1.

## III.      Factual Background

### A.      Plaintiff's Testimony and Reports

Plaintiff (born April 3, 1963) lived with her husband, who had dementia, and their 14-year-old son, who was autistic.  AR 41, 47.  She had completed a GED and worked at various jobs, including grocery clerk manager and accounting clerk.  AR 43, 44-45.  She had a driver's license and drove the family's vehicles once or twice a week.  AR 42-43.

Plaintiff stopped working in 2013 when she was unable to recover from a flu-like illness.  AR 47.  She experienced pain, rashes and bodily swelling, all of which caused her to become emotional and depressed.  AR 48.  She remained on antidepressants and testified that medication helped relieve her depression.  AR 48.  However, she still experienced considerable pain (7-8/10) and took Motrin as soon as she awoke.  AR 50.  Hot showers, ice, and heating pads also helped.  AR 50.  According to Plaintiff, she experienced only one to three good days a week.  AR 54.

Plaintiff testified that she avoided narcotic drugs and, despite contrary evidence in the medical records, had never had a problem with alcohol consumption.  AR 51-52.  She had been diagnosed with fibromyalgia and found Gabapentin helpful, although she could no longer afford it.  AR 52.

Plaintiff no longer made social plans because she did not know how she might feel on a future day. AR 54. She still would get up and cook two or three nights a week, but family members took care of cleaning and laundry. AR 54, 59. Plaintiff never went out alone. AR 59. As Plaintiff's husband's health was deteriorating, a sister-in-law has stepped in to do the grocery shopping and prepare meals once or twice a week. AR 58-59. Plaintiff's hand pain resulted in difficulty gripping objects, such as when opening a jar or lifting heavy objects. AR 58. Plaintiff was still able to unload the dishwasher, wash and dry clothes, and dust. AR 59.

On a typical day Plaintiff would wake up at 4:30 a.m. to have coffee before waking her son at 5:00 and helping him prepare for school. AR 55. On most days, Plaintiff would return to bed after the bus picked up her son at 6:30 a.m. AR 55. She would reawaken at 9:00 or 9:30 a.m., eat something, and walk outside to watch the family pets before returning to bed for two or three more hours. AR 55. She tried to be up and dressed when her son returned home at 3:00 p.m. AR 55. She would visit with her son, watch Dr. Phil,[2] and then prepare supper. AR 55-56. Generally, her husband cleared the table and washed the dishes after dinner while Plaintiff returned to bed. AR 56.

In her September 25, 2013, adult function report, Plaintiff reported that she had difficulty with memory and concentration exacerbated by her many medications and inability to sleep well. AR 227. Too much sitting or standing resulted in hip and leg pain. AR 227. She was very depressed. AR 227. Her husband took care of cooking and household tasks. AR 228. Depression and pain kept her from socializing and enjoying her prior interest in reading, camping and swimming. AR 231. She could no longer handle stress and had recently felt paranoid. AR 233.

## B. Third-Party Testimony and Reports (Non-Medical)

On September 25, 2013, Plaintiff's sister-in-law Tomi Husted submitted a third party adult function report. AR 213-221. Ms. Husted reported the Plaintiff was "extremely depressed"

---

[2] Plaintiff did not have the attention span to watch the complete show but the family recorded television shows so she could watch them again later. AR 56-57.

and did not have the social skills to function in a work environment.  AR 213.  Plaintiff was sleeping excessively and no longer seemed to care about personal needs and grooming.  AR 214-15.  She needed encouragement to do daily chores and refused to go out in public.  AR 215-16.  Plaintiff was unable to concentrate and could not do much physically.  AR 218.  Ms. Husted described Plaintiff as antisocial, emotional, self-pitying, angry and defensive.  AR 218.

### C. Medical Records and Opinions

**Primary care records (AR 316-56, 359-67, 442-578).**  Plaintiff's primary care physician was Kevin Wingert, M.D., at Community Medical Providers-Clovis.  In March 2013, nurse practitioner Jessica Stendel, MSN, FNP, noted that Plaintiff experienced hyperlipidemia, anxiety, depression, problems with smell, and bronchospasms from smoking. In August 2013, Plaintiff complained of muscle aches throughout her body and was experiencing bodily swelling.  Nurse Stendel diagnosed fibromyalgia and fatigue, and referred Plaintiff to physiatrist Carwile LeRoy, M.D., for her fibromyalgia.

Clinical psychologist Jeni-Ann Kren, Ph.D., provided Plaintiff's counselling.  On February 15, 2013, Dr. Kren advised Plaintiff's primary care providers that Plaintiff remained depressed, experiencing daily crying, difficulties with motivation and feelings of hopelessness.  Dr. Kren had doubled Plaintiff's antidepressant medication on February 13, 2013, and recommended that Plaintiff remain off work for another week.  If Plaintiff had not stabilized by then, she should be referred to a psychiatrist for further evaluation.  On February 21, 2013, Dr. Kren reported that Plaintiff remained significantly depressed and should be referred to a psychiatrist for evaluation of medication.

**Psychiatric Treatment (AR 378- 91, 405-09, 423-41, 625-40).**  Psychiatrist Lana Williams, M.D., treated Plaintiff at House Psychiatric Clinic, Inc. from March 2013 to January 2015.  At the initial interview Plaintiff complained of depression, characterized by poor sleep, decreased appetite, low energy and excessive guilt, but could not identify a specific trigger.  Despite therapy, Plaintiff felt weak, helpless, hopeless and worthless.  She had little concentration and could not function.  Her primary care physician had prescribed 100 mg. of Zoloft and her

therapist increased the dose to 300 mg., but Plaintiff found the higher dose intolerable and took only 100 mg.  Dr. Williams discontinued Zoloft and prescribed Prozac.  She also prescribed Restoril to help Plaintiff sleep.

As treatment continued, Plaintiff showed minimal improvement despite trials of various medications.  At times, Plaintiff expressed suicidal thoughts but had no intent, plan or means.  At some appointments Plaintiff felt a little better; at others, she felt depressed, sad, irritable and angry.

Plaintiff returned to House Psychiatric Clinic on January 22, 2016, complaining of depression, anxiety and sleep issues.  Her doctor prescribed Wellbutrin.

**Physiatrist (AR 397-400).**  On September 10, 2013, Plaintiff saw rehabilitative medicine specialist E. Carwile LeRoy, Jr., M.D. , for a consultation about symptoms attributed to fibromyalgia.  Plaintiff doubted the diagnosis.  Following an examination, Dr. LeRoy opined that Plaintiff's symptoms were consistent with fibromyalgia but that he needed to rule out polymyostitis and latent viral infections such as EBV, hepatitis, CMV and Lyme.

By a second appointment on October 29, 2013, testing had ruled out the various alternative diagnoses.  Although Dr. LeRoy could identify tender points, Plaintiff displayed independent ambulation, had a full range of motion in her major muscle group and reported no diminution of sensation or motor [*sic*].  The doctor prescribed Lyrica and asked Plaintiff to return in a month with all of her pill bottles.  The record includes no further reports from Dr. LeRoy.

**Dr. Kren's report (AR 370-72).**  On October 9, 2013, Dr. Kren provided a written report to Defendant.  From January 18 through December 28, 2006, Dr. Kren had treated Plaintiff for depression arising from Plaintiff's role as a caretaker to family members with cancer and several step-grandchildren.  By July 2006, Plaintiff continued to complain of significant depression and social isolation despite weekly therapy and prescription treatment with two antidepressants.  Dr. Kren referred Plaintiff to a psychiatrist and did not treat Plaintiff again until October 2006, when Plaintiff reported that she had stopped all medications, become more active, and was cleaning her house obsessively.  Plaintiff was also binge drinking, so treatment shifted its focus to

discontinuing Plaintiff's alcohol consumption. Plaintiff requested a determination that her emotional symptoms precluded her returning to her work as a grocery clerk. When Plaintiff did not return to work, her treatment ended because she lacked insurance.

Plaintiff returned to see Dr. Kren on February 8, 2013. She had never returned to her grocery clerk position but had been working for Fresno County as a billing clerk until her primary care provider had given her a "disability." Plaintiff sought help for depression and anxiety arising from a dysfunctional family situation and Plaintiff's inability to say "no." She complained of daily crying, low motivation, feeling overwhelmed, panic attacks and disturbed sleep. Plaintiff was regularly consuming alcohol. Plaintiff scored 51 on the Centers for Epidemiological Services Depression Scale, indicating some depressive symptoms.

Treated weekly for two months, Plaintiff's symptoms escalated rather than improved. At the same time, a psychiatrist treated Plaintiff with medication in an attempt to stabilize her symptoms. After cancelling appointments for several weeks, Plaintiff returned for one more session at which Dr. Kren referred her to a Twelve Step program. Plaintiff cancelled all further appointments because she had been terminated from her job and lost her insurance.

Dr. Kren diagnosed:

| | | |
|---|---|---|
| Axis I: | 296.33<br>305.0 | Major Depression, Recurrent, moderate<br>Alcohol Abuse |
| Axis II: | 301.9 | Personality Disorder Not Otherwise Specified, Borderline Traits |
| Axis III: | | Deferred to M.D. |
| Axis IV: | | Psychosocial and Environmental Problems: Dysfunctional family situation. |
| Axis V: | | Current GAF: 55, Highest GAF part year: 60 |

AR 371.[3]

---

[3] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994). A GAF of 51-60 corresponds to moderate symptoms or moderate difficulties in social, occupational, or school functioning. *Id.* at 32-35.

Dr. Kren cautioned that because she had not treated Plaintiff for five months, her report did not necessarily reflect Plaintiff's current mental health status.  She concluded:

> At the time she was seen, she was demonstrating significant stress from a dysfunctional family situation.  She was also engaging in poor coping behaviors such as excessive drinking.  Her symptoms tended to worsen when a determination needed to be made about whether she required more time off work.  Her symptoms appeared to be situational and not indicative of a permanent disability.

AR 371-72.

**Agency opinions.**  After reviewing Plaintiff's initial application for disability insurance benefits, Defendant identified Plaintiff's severe impairments to be affective disorders (primary impairment), COPD (secondary impairment), and fibromyalgia.  AR 79.  Other impairments included gastrointestinal disorders, personality disorders, and alcohol or substance addiction disorders.  AR 79.

On November 5, 2013, agency physician H. Amado, M.D., found that although Plaintiff had mental health impairments intertwined with physical health problems, family and social stresses contributed a significant situation component.  AR 80.  Dr. Amado opined that Plaintiff's mental health impairments were "fairly benign" with Plaintiff's being symptomatic but stable.  AR 80.  Accordingly, the doctor concluded that Plaintiff was capable of performing unskilled work in a low-stress nonpublic venue.  AR 80.

On reconsideration, agency physician E. Murillo, M.D., generally agreed with Dr. Amado.  AR 98.  On May 23, 2014, Dr. Murillo opined that Plaintiff had moderate limitations in understanding and remembering detailed instructions; carrying out detailed instructions; completing a normal workday and workweek without interruption from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest breaks; interacting appropriately with the public; getting along with peers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in the work setting.  AR 102-03.

On June 2, 2014, agency physician S. Amon, M.D., opined that Plaintiff could lift and carry fifty pounds occasionally and 25 pounds frequently; stand, walk, or sit six hours in an eight-hour work day; and push and pull in accordance with lift and carry limitations. AR 100. Plaintiff could frequently climb ramps or stairs, stoop, kneel and crouch, and occasionally crawl and climb ladders, ropes, and scaffolds. AR 100. Although left and right overhead reaching were limited, Plaintiff could perform unlimited handling, fingering and feeling. AR 100-01. She should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. AR 101.

**Consultative Psychiatric Examination (AR 412-15).** On May 4, 2014, psychiatrist Soad Khalifa, M.D., conducted a comprehensive psychiatric examination. Plaintiff presented various somatic complaints with related symptoms of depression. She told Dr. Khalifa that she had depression for two years as well as anxiety with nervousness and negative thinking. She denied anger, alcohol problems or suicidal or homicidal thoughts. Concentration, persistence and pace were good. Dr. Khalifa diagnosed:

| Axis I: | Dysthymic disorder |
| | Alcohol abuse by history, in partial remission |

| Axis II: | Deferred |

| Axis III: | Joint pain, numbness in the feet and hands, swelling in the joints, history of diagnosis of fibromyalgia, history of hysterectomy for tumors, history of being on hormones and she continues to be on the hormone patch |

| Axis IV: | Physical issues |
| | Resigned from her job February 2014 |

| Axis V: | GAF =55-60 |

AR 414.

The doctor opined:

> She should be able to perform simple task[s]. She will have difficulty performing detailed tasks because of her depressive symptoms and anxiety symptoms, excessive sleeping, pain and limited social skills.

///

///

For the above reasons, she will have difficulty accepting instructions, performing work activities, maintain[in]g regular attendance or dealing with the stress in the workplace.

AR 414-15.

**Consultative Orthopedic Examination (AR 418-22).** On May 17, 2014, orthopedist Dale H. Van Kirk, M.D., prepared a comprehensive orthopedic evaluation. After a physical examination, the doctor diagnosed (1) chronic cervical musculoligamentous strain/sprain, likely associated with degenerative disk disease; (2) chronic rotator cuff tendonitis of the shoulders bilaterally; and elements of fibromyalgia. The doctor noted, "The etiology of the hypersensitivity of the skin of the upper extremities and lower extremities is not obvious at this point in time." AR 422.

Dr. Van Pelt opined that Plaintiff was able to stand and/or walk for six hours in an eight-hour work day; sit without limitation; lift and carry 20 pounds occasionally and 10 pounds frequently; and was limited to frequent postural and manipulative activities. Because cold weather exacerbated her symptoms, Plaintiff should not work in a cold or damp environment.

**Valley Health Team (AR 593-617).** On October 14, 2015, Plaintiff had an initial examination at Valley Health Team to establish care. Her last physical examination had been two years earlier. Plaintiff stated that she was taking no medications and that she did not like sedating medications or narcotics. She recounted a history of lupus, fibromyalgia, psoriasis and hyperlipidemia.

**IV.    Standard of Review**

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less

9

than preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).  When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.        The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

> 42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.920(a)(4).  The ALJ must consider objective medical evidence and opinion testimony.  20 C.F.R. §§ 416.927; 416.929.

///

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his/her past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. §§ 416.920(a)-(f).

## VI.   Summary of the Hearing Decision

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard. AR 18-30. The ALJ found that Plaintiff had not engaged in substantial gainful activity since February 2, 2013. AR 18. Plaintiff's severe impairments were lupus, fibromyalgia, chronic rotator cuff tendonitis of both shoulders, and chronic cervical musculoligamentous sprain/strain. AR 18. The severe impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). AR 20. The ALJ concluded that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except lift and carry 20 pounds occasionally and ten pounds frequently; sit, stand, and walk for six hours in an eight-hour work day; and frequently climb, kneel, crouch, crawl, balance, handle, finger and feel. AR 20. Plaintiff was capable of perform her past relevant work as an accounting clerk. AR 28. Accordingly, the ALJ found that Plaintiff was not disabled. AR 30.

## VII.   Failing to Characterize Plaintiff's Mental Impairments as Severe Impairments Was Not Reversible Error

Plaintiff contends that the ALJ erred in failing to categorize her mental impairments as severe at step two. Defendant counters that the ALJ did not deny Plaintiff's application by

///

finding Plaintiff's mental health impairments not severe at step two. The Court agrees with Defendant.

At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987); 20 C.F.R. §416.920(a)(4)(ii). An impairment is a medically determinable physical or mental impairment or combination of physical or mental impairments. 20 C.F.R. § 416.902(f). If a claimant does not have an impairment or combination of impairments which significantly limit the claimant's physical or mental ability to do basic work activities, the Commissioner will find that the claimant does not have a severe impairment. 20 C.F.R. § 416.920(c).

"The step-two inquiry is a de minimus screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). "It is not meant to identify the impairments that should be taken into account when determining the RFC." *Buck v. Berryhill*, 869 F.3d 1040, 1048-49 (9th Cir. 2017). An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual['‎]s ability to work." *Id.* at 1290; SSR 85-28. "[T]he severity regulation is to do no 'more than allow the Secretary to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working.'" SSR 85-28 (quoting *Baeder v. Heckler*, No. 84-5663 (3d Cir. July 24, 1985)).

Even if an individual impairment is not sufficiently serious to prevent a person from working, an ALJ must consider the combined effect of all of the claimant's impairments on his/her ability to function as well as considering the claimant's subjective symptoms, such as pain or fatigue. *Smolen*, 80 F.3d at 1290. "If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process." SSR 85-28. The ruling warned:

> Great care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's abilities to do basic work activities, the sequential evaluation process should not end with the not severe

evaluation step. Rather, it should be continued. In such a circumstance, if the impairment does not meet or equal the severity level of the relevant medical listing, sequential evaluation requires that the adjudicator evaluate the individual's ability to do past work, or to do other work based on the consideration of age, education, and prior work experience.

SSR 85-28.

For example, Ms. Smolen suffered from childhood cancer that resulted in the loss of one kidney, loss of part of her left lung, changes in her remaining lung tissue, mild anemia, suppression of bone marrow production, and spinal scoliosis, all of which led to severe fatigue and back pain. *Smolen*, 80 F.3d at 1290. The ALJ found only a single severe impairment, "slight scoliosis," which limited her ability to walk and sit. *Id.* The step two analysis disregarded Ms. Smolen's subjective symptoms when determining severity. *Id.* The Ninth Circuit rejected the step two analysis: "Having found Smolen to suffer from only one "severe" impairment at step two, the ALJ necessarily failed to consider at step five how the combination of her other impairments—and resulting incapacitating fatigue—affected her residual functional capacity to do work." *Id.* at 1291.

Plaintiff's situation is distinguishable. After finding that Ms. Smolen had only one "severe" impairment at step two, the ALJ failed to consider at step five "how the combination of her other impairments—and resulting incapacitating fatigue—affected her residual functional capacity to do work." *Smolen*, 80 F.3d at 1291. Despite finding at step two that Plaintiff's mental health issues were not severe impairments individually or in combination, the ALJ in this case proceeded to carefully consider the evidence relating to Plaintiff's mental health impairments in her determination of Plaintiff's residual functional capacity at steps four and five. *See* AR 23-28.

"In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Buck*, 869 F.3d at 1049 (quoting *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p) (internal quotations omitted). As a result, a claimant's residual functional capacity should be the

same whether or not certain impairments are considered severe. *Buck*, 869 F.3d at 1049. Because the ALJ fully considered Plaintiff's mental health impairments in determining her residual functional capacity,[4] any error attributable to the ALJ's determination that Plaintiff's mental health issues were not severe impairments was harmless.

### VIII. The ALJ Provided Clear and Convincing Reasons for Rejecting Plaintiff's Pain Testimony

Plaintiff contends that the ALJ erred in failing to provide clear and convincing reasons for rejecting Plaintiff's pain testimony, particularly in light of Plaintiff's excellent work history. The Commissioner responds that the ALJ appropriately concluded that Plaintiff's testimony was not consistent with the record. The Court finds that the ALJ appropriately considered Plaintiff's credibility in the context of the record as a whole.

An ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). Determining the extent to which a claimant is credible is the province of the ALJ, who must consider the record as a whole in reaching his/her conclusion. *See Valentine v. Comm'r, Soc. Sec. Admin.*, 574 F.3d 685, 693(9th Cir. 2009); SSR 16-3p. The ALJ's findings of fact must be supported by specific, cogent reasons. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990).

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen*, 80 F.3d at 1281. First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281-1282. In this case, the first step is satisfied by the ALJ's finding that Plaintiff's "medically determinable

---

[4] Because the ALJ fully considered the evidence of record in the course of determining Plaintiff's residual functional capacity at step four, this Court need not address Plaintiff's contentions relating to the sufficiency of the medical record to prove that Plaintiff's mental health impairments were severe at step two.

14

impairments could reasonably be expected to produce the alleged symptoms." AR 21. The ALJ did not find Plaintiff to be malingering.

If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his symptoms only if he makes specific findings that include clear and convincing reasons for doing so. *Garrison*, 759 F.3d at 1014-15; *Smolen*, 80 F.3d at 1281. "If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). It is not sufficient for the ALJ to make general findings; he must state which testimony is not credible and what evidence in the record leads to that conclusion. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Bunnell*, 947 F.2d at 345-346. "[A] reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain." *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991).

The ALJ began her residual functional ability analysis by finding that Plaintiff's testimony was not fully consistent with the medical evidence. AR 21. To support this conclusion, the ALJ provided a detailed analysis of Plaintiff's physical (AR 21-23) and mental (AR 23-25) treatment records.

The ALJ noted the generally normal and mild results of physical examinations and testing. She also observed Plaintiff's pattern of selectively taking some prescriptions but not others, and of failing to follow up with laboratory tests ordered by her physicians. For example, at the June

13, 2012 examination, Plaintiff was walking daily and gaining weight, which she needed to do. AR 21. She demonstrated a normal straight leg raise, and normal deep tendon reflexes and sensation. AR 21. However Plaintiff had not been taking her prescribed Klonopin or gone for bloodwork since her last exam. AR 21. Similarly, physical examinations on March 15 and August 1, 2013, and February 4 and June 17, 2014, were generally normal. AR 22. Although Dr. LeRoy's September 2013 examination revealed tender points indicative of fibromyalgia, Plaintiff had a full active range of motion throughout her body, was not interested in alternative pain medication, and was not taking medication for fibromyalgia. AR 22. At the October 2013 appointment, Dr. LeRoy evaluated Plaintiff's tests, opined that fibromyalgia was the likely diagnosis, and prescribed Lyrica. AR 22. The record includes no record of further treatment of physical impairments until October 14, 2015, when Plaintiff sought a new primary care physician and reported that she was taking no prescription medications. AR 23.

The ALJ then summarized Plaintiff's treatment with Dr. Kren and Dr. Williams. AR 23-25. Dr. Kren provided Plaintiff with weekly psychotherapy and initially oversaw her prescriptions of antidepressant medications in consultation with Plaintiff's primary care physician. AR 355-57. After Plaintiff failed to report any change in symptoms despite substantial increases in medication, however, Dr. Kren recommended that Plaintiff need to be treated by a psychiatrist. AR 357.

In her October 2013 response to Defendant's inquiry, Dr. Kren's opined that Plaintiff's depression was situational and not indicative of a permanent disability. AR 372. The doctor noted that Plaintiff did not promptly schedule appointments and was not always compliant with medication. AR 371. When Plaintiff last saw Dr. Kren, she was had stopped taking all of her medications and was demonstrating poor coping behaviors, including excessive drinking. AR 371.

When Dr. Williams took over Plaintiff's mental health care in March 2013, she reported that although Plaintiff's primary care physician had increased her prescription for Zoloft from 100 mg. to 300 mg. Plaintiff had decided that the higher dose was intolerable and took only 100 mg. AR 391. Dr. Williams prescribed a different antidepressant and a sleep aid (Restoril). AR 391. Plaintiff rejected the sleeping pill prescription in favor of a muscle relaxant (Flexoril) previously prescribed by her primary care physician. AR 390. Over the course of treatment, Dr. Williams prescribed various antidepressant medications. Ultimately, Plaintiff's symptoms seemed to improve. AR 437-40.

The ALJ then proceeded to a detailed analysis of the opinions offered by Dr. Khalifa, Dr. Van Kirk, and the agency physicians. AR 25-27. The ALJ noted that, but for her depression, Plaintiff's mental health was generally normal and Plaintiff was not always compliant with the prescribed medications. AR 23-25. The ALJ gave little weight to Dr. Khalifa's opinion, finding it to be inconsistent with treatment records. AR 26. Interestingly, she declined to resolve the inconsistency between medical reports of Plaintiff's alcohol abuse and Plaintiff's testimony that she never had a problem with alcohol. AR 26. The ALJ gave generous weight to the opinion of Dr. Van Kirk, which she found to be consistent with treatment records. AR 26. The ALJ gave less weight to the opinions of the agency physicians in general since they had not examined Plaintiff. AR 26. She then proceeded to evaluate each agency physician's opinion, rejecting those opinions, or portions thereof, that were inconsistent with the treatment records. AR 26-27.

Because objective medical evidence did not lead to a determination that was favorable to Plaintiff, the ALJ then proceeded to consider subjective testimony. AR 37. She reviewed the adult function form completed by Ms. Husted, but gave it little weight, particularly to the extent

///

that it was inconsistent with Plaintiff's medical record. AR 27. Finally, the ALJ addressed

Plaintiff's subjective testimony and reports:

> Although the claimant has described daily activities, which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, alleged daily activities cannot be objectively verified with any degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

> Despite the complaints of allegedly disabling symptoms, there have been significant periods of time since the alleged onset date during which the claimant has not taken any medications for those symptoms. The treatment rendered to the claimant has been very conservative and routine in nature. When the claimant has been prescribed and taken appropriate medications, the record reveals they were relatively effective in controlling her symptoms.

> The claimant's ability to drive shows concentration and persistence, an ability to use hand and foot controls, an ability to turn [her] head (say, when backing up or changing lanes), visual acuity, and an ability to deal with the stress inherent in operation of a motor vehicle.

> She completed disability forms in a detailed and coherent manner, demonstrating her ability to follow directions, answer questions, persist in the completion of a task, and remember recent and remote details. The claimant was able to pay attention, behave appropriately, remember recent and remote details, answer questions, follow directions, and persist throughout the approximately 40 minute long hearing, belying any assertions to the contrary.

> AR 21 (internal citations to record omitted).

As the Ninth Circuit recently acknowledged, SSR 16-3p "makes clear what our precedent

already required: that assessments of an individual's testimony by an ALJ are designed to

'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has

a medically determinable impairment(s) that could reasonably be expected to produce those

18

symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." *Trevizo v. Berryhill*, 871 F.3d 664, 678 n.5 (9th Cir. 2017) *see also Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (Posner, J.). Because a "claimant's subjective statements may tell of greater limitations than can medical evidence alone," an "ALJ may not reject the claimant's statements regarding her limitations merely because they are not supported by objective evidence." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147-48 (2001) (quoting *Fair v. Bowen*, 885 F.2d 597, 602 (9th Cir. 1989)). *See also Bunnell*, 947 F.2d at 347 (when there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of his/her symptoms solely because they are unsupported by medical evidence). "Congress clearly meant that so long as the pain is *associated* with a clinically demonstrated impairment, credible pain testimony should contribute to a determination of disability." *Id.* at 345 (internal quotation marks and citations omitted).

Nonetheless, the law does not require an ALJ simply to ignore inconsistencies between objective medical evidence and a claimant's testimony. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)). An ALJ properly considers whether the medical evidence supports or is consistent with a claimant's pain testimony. *Id.*; 20 C.F.R. §§ 404.1529(c)(4), 416.1529(c)(4) (symptoms are determined to diminish residual functional capacity only to the extent that the alleged functional limitations and restrictions "can reasonably be accepted as consistent with the objective medical evidence and other evidence"). Nonetheless, a claimant's statement of pain or other symptoms is not conclusive evidence of a physical or mental impairment or disability. 42

U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p, 2017 WL 5180304 (Oct. 25, 2017). "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to the [Social Security Act]." *Fair*, 885 F.2d at 603.

An ALJ may reject symptom testimony that is contradicted by or inconsistent with the record and, as long as other reasons are provided, lacking the support of objective medical evidence. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008)(holding that the ALJ did not err in rejecting Carmickle's testimony that he could lift ten pounds occasionally in favor of a physician's opinion that Carmickle could lift ten pounds frequently); *Rollins*, 261 F.3d at 857; *Tonapetyan*, 242 F.3d at 1148. The ALJ in this case appropriately concluded that Plaintiff's daily activities were not as limited as she alleged.

The medications, treatments, and other methods used to alleviate symptoms are also "an important indicator of the intensity and persistence" of a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.1529(c)(3); SSR 16-3p. For example, an ALJ may consider unexplained or inadequately explained failure to seek or follow through with treatment, *Tommasetti*, 533 F.3d at 1039; the use of conservative treatment, *Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007); and any other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(vii), 416.1529(c)(3)(vii). In this case, the ALJ contrasted Plaintiff's allegations of disabling pain and symptoms with a "very conservative course of treatment," consisting primarily of medication and medication management. The ALJ concluded:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, the claimant's statements are not consistent with the above residual

functional capacity assessment, which does incorporate certain limitations that are well supported by the medical evidence of record.

AR 21.

If the ALJ's credibility finding is supported by substantial evidence in the record, courts "may not engage in second-guessing." *Thomas*, 278 F.3d at 959. The Court will not second guess the ALJ's assessment of Plaintiff's credibility in this case.

**IX.     Conclusion and Order**

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff, Susan Lynne Ashmore.

IT IS SO ORDERED.

Dated:   __**November 19, 2018**__          _____**/s/ Gary S. Austin**_____
                                          UNITED STATES MAGISTRATE JUDGE

21